IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

MICHAEL DONN BARTZ,

                Plaintiff,           OPINION AND ORDER

  v.

                                    24-cv-398-wmc

MELINDA DERUS, ERIN
DUNAHAY, CHAD McCUNE,
ERIC SPECKHART, AMANDA
LUEBCHOW, and NICOLE TREVINO,

                Defendants.

Plaintiff Michael Donn Bartz, who is incarcerated at Jackson Correctional Institution ("JCI") and representing himself, was granted leave to proceed with Eighth Amendment and state-law negligence claims against members of JCI's Special Needs Committee, including Melinda Derus, Erin Dunahay, Chad McCune, Erick Speckhart, Amanda Luebchow, and Nicole Trevino. (Dkt. #16.) More specifically, plaintiff suffers from degenerative disc disease and cervical radiculitis/radiculopathy and claims that defendants have wrongly refused to accommodate his medical needs by denying his requests for (1) an extra pillow to alleviate neck pain; (2) "button up" shirts that would enable him to dress more easily; and (3) a low-bunk restriction to avoid unnecessary falls and pain. Plaintiff has also filed motions for a preliminary injunction and temporary restraining order directing the defendants to reinstate his previous accommodations. (Dkt. #4, #15.) The court held a video hearing with both plaintiff and counsel for defendants on January 23, 2025, during which the court granted plaintiff's motion for a temporary restraining order (dkt. #15) and directed defendants to immediately reinstate plaintiff's lower-bunk restriction. For reasons set forth below and stated on the record at the hearing, plaintiff's motion for a preliminary injunction is also granted.

BACKGROUND[1]

After Bartz complained of persistent neck pain with numbness and weakness in his right arm, he was diagnosed by a physician with degenerative disc disease throughout his cervical spine in 2018. (Dkt. #7-2, at 23-24, 45-46.) He was prescribed a course of physical therapy, including cervical traction, which the clinical notes show increased his neck pain and caused numbness in his arms and legs. (*Id*. at 27, 30, 37, 39-40.) In August of 2019, Bartz reported to the JCI Health Services Unit ("HSU") that he was experiencing "worsening neck pain" that was "constant" and that he was also experiencing "decreased neck rotation" and "intermittent numbness down [his] right arm with weakness." (Dkt. #7-2, at 23.) A physician ordered a cervical spine MRI with an offsite provider with consideration for a neurology consultation. (*Id*. at 24.)

An MRI conducted at Black River Memorial Hospital in November of 2019, after which a diagnostic radiologist, Dr. Todd Ebbert, found "severe degenerative" changes that were "most pronounced at C5-C6 and C6-C7" vertebrae. (Dkt. #7-2, at 49.) Specifically, after reviewing the MRI results, Dr. Ebbert observed "[s]evere foraminal narrowing" at C5-C6 and C6-C7,[2] with "[d]isc osteophyte complex" and "uncinate spurring." (*Id*.) The physician noted further that at C6-C7 there was a "[r]ight subarticular probable disc herniation component with superior migration." (*Id*.)

---

[1] Unless otherwise indicated, the following facts are taken from medical records provided by plaintiff (dkt. #7-2) and declarations from the parties regarding plaintiff's medical restrictions.

[2] Foraminal narrowing is a type of spinal stenosis (narrowing of the one or more of the open spaces in the spine) that may be congenital or due to spinal degeneration, causing compression or encroachment of the vertebrae onto nerves in the vertebral canal, which can result in pain, paresthesia, and neurogenic claudication or weakness. Dorland's Illustrated Medical Dictionary 1770 (32nd ed.).

Bartz continued to experience neck pain with numbness and tingling with weakness in his right arm in 2020. (Dkt. #7-2, at 22.) He advised a nurse in September of 2020, that he had numbness and tingling in both arms with neck pain ranging from a level of "3-10," depending on his level of movement. (Dkt. #7-2, at 43.) Bartz specifically advised the nurse that getting up and down from his assigned top bunk increased his neck pain. (*Id.*)

Bartz was again seen at the Black River Memorial Hospital in February of 2021, by a pain specialist with the Mayo Clinic, Dr. Stephen Endres, who found "significant" degenerative disease at his C5-C6 with foraminal narrowing at C6-C7, and "cervical radiculitis/radiculopathy" that was greater on his right side than the left.[3] (Dkt. #7-2, at 52.) In particular, Dr. Endres was "very concerned" about the weakness on Bartz's right side, as well as the "significant narrowing" of his spine, "particularly of C5-C7." (*Id.*) When discussing treatment options, Bartz stated that he was not interested in an injection because any relief would be "short-lived," to which Dr. Endres agreed. (*Id.*) Due to the significant foraminal narrowing and his concerns about Bartz's weakness, therefore, Dr. Endres concluded that seeing a neurosurgeon would be "the next obvious step for his care," but Bartz wanted to "think things over" before surgery. (*Id.*) Ultimately, Bartz was not scheduled to see a neurosurgeon, nor has he received any other "definitive plan of care" from prison medical providers. (Bartz Decl. (dkt. #7) ¶ 14.)

Given these findings, Bartz credibly alleges that he suffers from a chronic, degenerative condition causing him ongoing pain, weakness, and numbness in his neck, arms, and hands,

---

[3] Radiculitis is defined as "inflammation of the root of a spinal nerve, especially of that portion of the root which lies between the spinal cord and the intervertebral canal." Dorland's Illustrated Medical Dictionary 1571 (32nd ed.) Cervical radiculopathy is a disease of the nerve roots, often with neck or shoulder pain, that is commonly caused by compression of the nerve roots. *Id.*

which has impaired his physical abilities. Specifically, Bartz reports a loss of range of motion with sudden, unpredictable losses of strength, dexterity, and coordination of his arms and hands, particularly on his right side. Dr. Endres, who examined him in 2021, also confirmed that Bartz's right grip strength was "very significantly weak." (Dkt. #7-2, at 52.)

Because these impairments have affected his ability to grip objects, such as ladder rungs, the JCI HSU authorized him to have an extra pillow to stabilize his neck while sleeping and button-up shirts to enable him to dress and undress without raising his arms over his head. (Dkt. #7-2, at 1-2, 43-44.) Bartz was also granted a lower-bunk restriction on September 24, 2020, which expired on March 24, 2021. While maintaining this restriction temporarily, Bartz was then subjected to review by the Special Needs Committee January 8, 2022. (Luebchow Decl. (dkt. #23) ¶¶ 9, 10.) On February 24, 2022, the Special Needs Committee denied Bartz's request to renew his lower-bunk restriction, and he was subsequently assigned to an upper bunk. (Dkt. #7-2, at 9-10.) However, after Bartz reported falling twice in short succession from an upper bunk (dkt. #7-2, at 3), a nurse in the HSU again issued him another lower-bunk restriction on June 17, 2022, for a period of one year. (Luebchow Decl. (dkt. #23) ¶ 11.) This restriction was renewed on February 15, 2023, apparently by a nurse, for another one-year period expiring on February 15, 2024. (*Id*.)

At the time Bartz was granted each of these accommodations, special needs restrictions based on medical necessity were governed by Health Services Policy and Procedure ("HS P/P") 300.07. (Trevino Decl. (dkt. #22) ¶ 10.) Under this policy, a DOC prisoner could obtain a lower bunk restriction for several conditions, including significant functional limitations secondary to arthritis, musculoskeletal disorders or neurological disorders. (*Id*. at ¶ 13.) Staff in the HSU also had the discretion to give a temporary restriction for a low bunk based on

4

their judgment, provided it did not conflict with the medical judgment of an Advanced Care Provider ("ACP"). (*Id*. at ¶ 14.) Generally, longer restrictions needed to be approved by a Special Needs Committee, although this was less than clear under that policy. (*Id.*)

On May 5, 2023, however, HS P/P 300.07 was replaced with Department of Corrections ("DOC") Division of Adult Institutions ("DAI") Policy 500.30.07. (Trevino Decl. (dkt. #22) ¶ 15.) Under DAI Policy 500.30.07, all DAI facilities "***shall*** provide medical restrictions and aids to reduce effects of impairment in a timely manner when medically indicated as determined by the [ACP]," which is defined as a provider with prescriptive authority "or the Special Needs Committee." (Dkt. #7-11, at 1 (emphasis added).) The Special Needs Committee itself is described in the Policy as "[a] facility multidisciplinary committee that reviews requests for special needs/restrictions/adaptations." (*Id*. at 2.) Staff in a facility HSU may grant "temporary special needs/restrictions/adaptations for short term use for a permanent impairment or an acute health problem" *without* approval from the Special Needs Committee, but only for a maximum term of 90 days. (*Id*.) A longer restriction or adaptation generally requires approval by the Special Needs Committee under the new policy, which may be granted for a maximum of one year, subject to annual review. (*Id*.) Moreover, a DOC prisoner seeking renewal of the restriction or adaption is responsible for requesting renewal *before* the expiration date. (*Id*.)[4]

---

[4] There is an exception to the annual review requirement for impairments that require a permanent accommodation as documented by an ACP and approved by the Class III Prior Authorization Committee, which is composed of licensed health care professionals who meet four times a month to review the medical necessity of treatments, equipment, or restrictions. (*Id*.) However, it does not appear that Bartz's long-standing, degenerative disc disease and severe foraminal narrowing was ever reviewed by that committee.

5

On February 6, 2024 -- just 9 days before expiration of his extended lower-bunk restriction -- Bartz was examined by Nurse Luebchow in the JCI HSU. (Dkt. #7-2, at 5-6.) While Luebchow noted that Bartz had "limited range of motion in his arms" and "impaired comfort" in his shoulders, because there were no recent falls documented, she concluded that he no longer qualified for a low-bunk restriction. (Luebchow Decl. (dkt. #23) ¶ 14-16.) Thereafter, on February 29, 2024, the Special Needs Committee consisting of defendants Derus, Luebchow, Dunahay, Trevino, McCune, and Speckhart refused to renew Bartz's restriction for a lower bunk, stating that his request "[did] not meet criteria as defined in policy." (Dkt. #7-2, at 7.) Presumably for similar reasons, they also denied his request for button-up shirts and an extra pillow to alleviate his neck pain. (*Id.*)

By affidavit, defendant Trevino now further explains that consistent with DAI Policy 500.30.07, the JCI Special Needs Committee is comprised of one or more staff representatives from HSU, staff representatives from security, and non-security staff representatives. (Trevino Decl. (dkt. #22) ¶ 22.) Defendant Derus is a Unit Manager at JCI and serves as the ADA Coordinator on the Special Needs Committee. (Dkt. #1, at ¶ 2.) Defendant Luebchow is a registered nurse. (*Id.* at ¶ 6.) Defendant Dunahay is an Administrative Captain at JCI. (*Id.* at ¶ 3.) Defendant Trevino is the Health Services Assistant Manager and a registered nurse. (*Id.* at ¶ 7; Trevino Decl. (dkt. #22) ¶ 2.) Defendant McCune is a Recreation Leader. (Dkt. #1, at ¶ 4.) Defendant Speckhart is a Litigation Coordinator and a Corrections Program Supervisor. (*Id.* at ¶ 5.) During meetings of the Special Needs Committee, the HSU representative will review the patient's chart and request any additional information, while other facility staff member provide information based on their role, interactions, and observations of the patient. (Id. at ¶ 5.)

6

While serving as members of JCI's Special Needs Committee, Bartz claims that defendants disregarded a serious medical need in the form of accommodations for his degenerative disc disease and cervical radiculitis/radiculopathy, causing him "great pain" and placing him at risk for injury from falls.  (Dkt. #5, at 1-2; Bartz Decl. (dkt. #7) ¶ 48.)  Bartz further contends that without the extra pillow to "align" his neck at night, he has woken repeatedly with neck pain as well as numbness and tingling in his arms and hands.  (Bartz Decl. (dkt. #7) ¶ 20.)  Medical records also show that as soon as his lower-bunk restriction was removed, Bartz reported "daily pain" in his neck radiating bilaterally to his shoulders even while at rest.  (Dkt. #7-2, at 58.)  In addition, a month after defendants took away his lower-bunk restriction, Bartz fell from his assigned upper bunk on April 1, 2024, sustaining injuries to his face and neck, as well as breaking his prescription eyeglasses.  (Bartz Decl. (dkt. #7) ¶ 22.)  At that time, medical records reflect that Bartz was also treated at Black River Memorial Hospital for a one centimeter laceration above his right eyebrow, which was cleaned and repaired with adhesive Steri-Strips.  (Dkt. #7-2, at 65, 67.)  While a cervical CT scan disclosed no acute osseous injury or traumatic misalignment, it did again show "degenerative changes posteriorly" at C5-C7 that were similar when compared to his previous examination in 2019.  (*Id*. at 65, 70.)

On April 4, 2024, Bartz had a follow up appointment at JCI HSU with Dr. Nicholas Castillo.  (Bartz Decl. (dkt. #7) ¶ 24.)  Dr. Castillo observed muscle spasms and tenderness in Bartz's neck, for which he prescribed an intramuscular injection of Toradol in Bartz's right deltoid and cyclobenzaprine for 21 days to help with muscle spasms.  (Dkt. #7-2, at 64.)  While Bartz reported at a subsequent appointment that the injection was "helpful," he further reported that he was still experiencing pain.  (Dkt. #22-1, at 39.)  Bartz also alleges he told

7

Dr. Castillo that he was afraid of falling again from the top bunk, and he advised Bartz to "be very careful from now on." (Bartz Decl. (dkt. #7) ¶ 24.) Dr. Castillo also reportedly ordered that Bartz be provided with an extra pillow (*id.*), and Bartz confirmed at the hearing that he had received one.[5]

OPINION

In denying his requested restrictions on February 29, 2024, Bartz contends that defendants violated prison policy by failing to consider whether his medical condition had changed as required by DAI Policy 500.30.07. Bartz notes that there is nothing in his medical records showing that a health care provider had determined that his requested accommodations were not "medically necessary" before the February 29 decision last year. (Bartz Decl. (dkt. #7) ¶ 32.) According to an appendix to DAI Policy 500.30.07, Bartz notes further that a low bunk restriction may be granted for prisoners such as himself, who are at risk for falls:

> [A DOC prisoner] may be ordered a low bunk restriction if they have a medical condition that significantly impairs vision, mobility, balance, cognition, agility or strength. [Prisoners] shall not be placed in an upper bunk if it represents an imminent fall hazard that could reasonably be avoided by an individual with adequate vision, dexterity, and strength, and cognition. A person should be restricted from the upper bunk if they have a medical condition that represents a higher than average likely hood [sic] of severe injury if that person fell from the upper bunk or if there is an uncontrolled medical condition that places them at increased risk of a sudden unpredictable loss of mobility, balance or cognition. …

(Dkt. #7-11, at 5-6.)

Bartz contends, therefore, that the defendants denied the requested accommodations with deliberate indifference to his serious medical needs. (Dkt. #1, at ¶ 151.) Bartz also seeks

---

[5] To the extent that Bartz requested preliminary injunctive relief in the form of an extra pillow, it appears that this request is now moot.

a preliminary injunction preventing the Special Needs Committee from further withholding medical accommodations that had been provided to him before February 29, 2024, particularly the lower-bunk restriction. (Dkt. ##4-5.) According to plaintiff, the lack of an extra pillow to stabilize his neck at night in particular contributes to the numbness in his hands and his ability to grip the ladder when climbing to and from his top bunk. (Dkt. #7.) More recently, Bartz filed a motion for a temporary restraining order seeking relief in the form of a lower-bunk restriction. (Dkt. #15, at 2.)

The standard for determining whether a temporary restraining order or preliminary injunction is appropriate is the same. *See Planned Parenthood of Wis., Inc. v. Van Hollen*, 963 F. Supp. 2d 858, 865 (W.D. Wis. 2013) (citing *Winnig v. Sellen*, 731 F. Supp. 2d 855, 857 (W.D. Wis. 2010)). "As a threshold matter, a party seeking a preliminary injunction must demonstrate (1) some likelihood of succeeding on the merits, and (2) that it has 'no adequate remedy at law' and will suffer 'irreparable harm' if preliminary relief is denied." *International Ass'n of Fire Fighters, Local 365 v. City of East Chicago*, 56 F.4th 437, 446 (7th Cir. 2022) (quoting Cassell v. Snyders, 990 F.3d 539, 544-45 (7th Cir. 2021)). If the movant makes this showing, the district court must then consider two additional factors: "the irreparable harm the non-moving party will suffer if preliminary relief is granted, balancing that harm against the irreparable harm to the moving party if relief is denied" and "the public interest, meaning the consequences of granting or denying the injunction to non-parties." *Id*.

In addition, requests for injunctive relief in the prison context must comply with the requirements of the Prison Litigation Reform Act ("PLRA"), 18 U.S.C. § 3626. *See Westefer v. Neal*, 682 F.3d 679, 683 (7th Cir. 2012). Before granting prospective relief, a court must find that the relief: (1) is narrowly drawn; (2) extends no further than necessary to correct the

violation of the federal right; and (3) is the least intrusive means necessary to correct the violation of the federal right. 18 U.S.C. § 3626(a)(2). Not only must these findings be made, but the court must also give "substantial weight to any adverse impact on public safety or the operation of a criminal justice system caused by the relief." *Id*.

Defendants argue that plaintiff has failed to meet any of the criteria for a preliminary injunction, particularly because his argument that he will suffer irreparable harm without a lower-bunk restriction is conclusory and unsupported by medical records. Without disputing the elements he must establish to prevail on a request for preliminary injunctive relief, including the additional requirements of the PLRA, plaintiff has responded with additional briefing. (Dkt. ##29, 30.)

**I. Reasonable Likelihood of Success**

By refusing to renew his accommodations, plaintiff's primary claim is that the defendants were deliberately indifferent to his serious medical needs in violation of the Eighth Amendment to the United States Constitution. At this stage of the analysis, a plaintiff "need not show that [he] will definitely win the case," or even provide proof by a preponderance of the evidence. *Ill. Republican Party v. Pritzker*, 973 F.3d 760, 763 (7th Cir. 2020). Instead, a plaintiff is only required to demonstrate how they "propose[] to prove the key elements" of their case. *Id*.

A prison official may violate the Eighth Amendment if the official is "deliberately indifferent" to a "serious medical need." *Estelle v. Gamble*, 429 U.S. 97, 104-05 (1976). A prisoner states an Eighth Amendment claim concerning medical needs by alleging that: (1) he has an objectively serious medical condition; and (2) defendants acted with deliberate

10

indifference to that condition. *Arnett*, 658 F.3d at 750; *Forbes v. Edgar*, 112 F.3d 262, 266 (7th Cir. 1997). An objectively serious medical condition is either one that is diagnosed by a physician and mandates treatment, or is one that is so obvious that a layperson would understand a doctor is needed. *King v. Kramer*, 680 F.3d 1013, 1018 (7th Cir. 2012) (citing *Zentmyer v. Kendall Cty.*, 220 F.3d 805, 810 (7th Cir. 2000)). The defendants do not dispute that plaintiff's degenerative disc disease, which was diagnosed by a physician, and his resultant pain qualify as objectively serious medical conditions. The disagreement lies as to whether he requires any of the requested accommodations.

To satisfy the second element of the deliberate-indifference standard, a plaintiff must further allege sufficient facts for a reasonable trier of fact to find that each defendant actually knew of, but was deliberately indifferent to, a substantial risk to his health. *Petties v. Carter*, 836 F.3d 722, 728 (7th Cir. 2016). Here, plaintiff alleges that every member of the Special Needs Committee at JCI was aware of his degenerative disc disease, associated pain and the impairment of his physical abilities, including: his history of falling after being assigned to an upper bunk; his need for button-up shirts; and his need to alleviate neck pain with an extra pillow. (Dkt. #1, at 13 ¶¶ 50-53.) Yet he further alleges defendants deliberately failed to take reasonable steps to accommodate his impairments, which were documented in his medical records and supported by a physician's diagnosis of a degenerative condition. (*Id.*)

To begin, if a prisoner has a medical need for accommodations such as a lower bunk, failing to provide appropriate restrictions can violate the Eighth Amendment. *See Seymour v. Kostchyz*, No. 22-cv-170-jdp, 2022 WL 20328157, at *2 (W.D. Wis. Aug. 19, 2022)

11

(citing *Klein v. O'Donnell*, No. 19-cv-887-bbc, 2019 WL 11786778, at *3 (W.D. Wis. Dec. 30, 2019); *Verrier v. Murphy*, No. 19-cv-1812, 2020 WL 1975168, at *6 (E.D. Wis. Apr. 24, 2020)). Because plaintiff has alleged that members of the JCI Special Needs Committee were aware of physical impairments recognized by outside medical specialists, but deliberately refused to accommodate his needs by continuing to grant a lower-bunk restriction based on a nurse's recommendation, he appears to have established some likelihood that he will prevail on his Eighth Amendment claim against those defendants. Moreover, whether or not the Committee was aware of these underlying diagnoses of chronic, deteriorating conditions by specialists were brought to the Committee members' attention at the time they removed the lower bed restriction, there is an even greater likelihood that plaintiff is entitled to prospective relief in the form of a permanent injunction.

## II. Irreparable Harm and Adequacy of Remedy at Law

In addition to showing that he has a reasonable likelihood of success on the merits of his claims, plaintiff must show that he will suffer irreparable injury for which there is no adequate remedy at law absent injunctive relief. Harm is irreparable if legal remedies available to the movant are inadequate, meaning they are seriously deficient as compared to the harm suffered. *Life Spine, Inc. v. Aegis Spine, Inc.*, 8 F.4th 531, 545 (7th Cir. 2021).

Here, plaintiff contends that without injunctive relief he will likely suffer irreparable harm. Medical records document that plaintiff fell twice after his lower-bunk restriction expired in 2022, causing HSU staff to re-issue the lower-bunk restriction. (Dkt. #7-2, at 3.) Plaintiff further represents that shortly after his low-bunk restriction was denied by defendants

on February 29, 2024, he fell from his bunk on April 1, 2024, and hit his head on the floor. (Bartz Decl. (dkt. #7) ¶ 22.) Plaintiff also presents contemporaneous medical records showing that he sustained a laceration on his face due to the fall, and claims that he has suffered increased, ongoing neck pain since that fall. (*Id*. at ¶¶ 29, 48; Dkt. #7-2, at 65-70.)

Defendants argue that plaintiff cannot establish a threat of irreparable harm because his medical records document only the one fall causing injury that occurred on April 1, 2024. (Trevino Decl. (dkt. #22) ¶ 40.) In addition, defendants point to medical records of subsequent appointments on April 4, and May 6, 2024, and an affidavit from Dr. Castillo, all showing that plaintiff did not repeat his request for a lower-bunk restriction. (Castillo Decl. (dkt. #24) ¶¶ 12, 13, 16.) Based on those appointments, Dr. Castillo states that he did not believe that a lower-bunk restriction was necessary for plaintiff. (*Id*. ¶¶ 12, 15.)

In response, plaintiff presents a declaration that is supported by a journal he began keeping after his fall on April 1, 2024, showing that there have been many other instances in which he has lost his grip and slipped from the ladder while attempting to maneuver up to and down from his assigned upper bunk. (Bartz Decl. (dkt. #29); #29-1.) Plaintiff estimates that he has lost his grip on the bunk ladder and bed frame as a result of his physical impairments no less than 20 times since the Special Needs Committee's decision on February 29, 2024. (Bartz Decl. (dkt. #29) ¶ 4; Dkt. #30, at 6.) While plaintiff acknowledged at the hearing on January 23, 2025, that he had not reported these falls to HSU staff or the Special Needs Committee, he also points to correspondence in the record showing that he advised defendant Trevino on at least two occasions that he had lost his grip and slipped from his bunk ladder, despite being "extra careful," on April 5, 2024, and again on May 2, 2024. (Dkt. #30, at 5) (citing Dkt. #7-3, at 4, 17.) Although plaintiff concedes that these falling incidents resulted

13

in lesser degrees of pain and injury than he suffered on April 1, 2024, he argues that these falling incidents are painful nonetheless and place him at risk for even more serious injury if he is not restricted to a lower-bunk. (Dkt. #30, at 6.) Plaintiff explains further that he has stopped communicating these falling incidents to HSU staff because "his complaints had fallen on deaf ears." (Dkt. #30, at 5.) Due to his degenerative disc disease, plaintiff adds that he continues to experience unnecessary pain and difficulty on a daily basis simply by undertaking to climb up and down the ladder to his upper bunk. (Bartz Decl. (dkt. #29) ¶ 3.)

Given plaintiff's reports of ongoing neck pain, numbness, and significant weakness on his right side, which are supported by medical examinations and diagnoses by outside specialists showing a degenerative condition in both 2019 and 2021, the court concludes that plaintiff credibly demonstrates that he faces irreparable harm for which he has no adequate remedy at law in the absence of injunctive relief.

**III. Balancing Analysis**

Where a plaintiff satisfies the threshold requirement for a preliminary injunction, courts weigh "the irreparable harm the moving party will endure if the preliminary injunction is wrongfully denied versus the irreparable harm to the nonmoving party if it is wrongfully granted." *K.C. v. Individual Members of the Medical Licensing Bd. of Indiana*, 121 F.4th 604, 632 (7th Cir. 2024) (citations and internal quotation marks omitted). "This is a sliding scale -- the more likely [the moving party] is to win, the less the balance of harms must weigh in his favor; the less likely he is to win, the more it must weigh in his favor." *Id*. at 633 (alteration in original). Part of this balancing process includes evaluating the public interest and the effects the preliminary injunction -- and its denial -- would have on nonparties. *Id.*

For reasons set forth above, plaintiff has demonstrated a reasonable likelihood of success on his claim that -- as health care representatives on the Special Needs Committee -- defendants Trevino and Nurse Luebchow have violated the Eighth Amendment by acting with deliberate indifference to a serious medical need, knowing that he has a history of falling from the bunk and has fallen again since the lower-bunk restriction was denied on February 29, 2024. The harm that plaintiff will likely suffer, particularly if not granted a lower-bunk restriction, is potentially severe should he fall from the top bunk. *See, e.g., Estate of Simpson v. Gorbett*, 863 F.3d 740-, 743 (7th Cir. 2017) (involving an inmate who rolled out of his assigned top bunk onto the concrete floor, hitting his head, and later died of injuries sustained from his fall). Moreover, the undisputed pain that plaintiff suffers on an ongoing basis far outweighs harm the defendants might experience, if any, from granting him a lower-bunk restriction for the pendency of this suit. Likewise, the public, which includes the taxpayers of the State of Wisconsin, has an interest in maintaining safe prisons and in avoiding additional claims for injuries plaintiff may well sustain from another fall from the top bunk.

Accordingly, the court concludes that the balance of the relevant factors favors plaintiff. Therefore, mindful of the restrictions on prospective relief imposed by the PLRA, 18 U.S.C. § 3626(a)(2), the court will grant plaintiff's motion for preliminary injunctive relief and will direct the defendants to provide him with a lower-bunk restriction for the duration of this lawsuit.

ORDER

IT IS ORDERED that:

1) Plaintiff Michael Donn Bartz's motion for a preliminary injunction (dkt. #4) is GRANTED in part as set forth below.

2) Defendants shall provide plaintiff with a lower-bunk restriction for the duration of this lawsuit.

Entered this 24th day of January, 2025.

                              BY THE COURT:

                              /s/

                              _____
                              WILLIAM M. CONLEY
                              District Judge